IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>WILLIAM ANTHONY EVERETT and<br>MARCUS LAMONT WARD, JR.,<br><br>    Defendants. | CRIMINAL ACTION FILE NO.<br><br>1:17-CR-020-RWS-JKL |

## ORDER AND FINAL REPORT AND RECOMMENDATION

On January 17, 2017, a federal grand jury seated in the Northern District of Georgia returned a five-count indictment against Defendants William Anthony Everett and Marcus LaMont Ward. [*See* Doc. 1] Counts One and Two charge Everett with the October 3, 2016 armed robbery of a Community Bank & Trust ("CB&T") bank in Hogansville, Georgia, and brandishing a firearm during the robbery. [*Id.* at 1-2.] Counts Three and Four charge both defendants with the October 7, 2016 armed robbery of a CB&T bank in LaGrange, Georgia, and brandishing a firearm during that robbery. [*Id.* at 2-3.] Count Five charges Everett with possession of a firearm by a convicted felon. [*Id.* at 3.]

The case is before the Court on following pretrial motions:

— Ward's Motion to Suppress Stop, Seizure, and Search of Vehicle and Evidence Seized [Doc. 38];

— Ward's Motion to Suppress GPS Tracker [Doc. 39];

— Ward's Motion to Suppress Statement [Doc. 40];

— Everett's Motion to Suppress ID Evidence [Doc. 41];

— Everett's Motion to Suppress Evidence From GPS Tracker and Fruits of the Unconstitutional Use of the Tracking Device [Doc. 42]; and

— Everett's Motion to Suppress Evidence seized in connection with a traffic stop [Doc. 43].

On August 15, 2017, I held an evidentiary hearing on the foregoing motions. [Docs. 57, 58 (defendants' exhibits), 59 (the government's exhibits), 60 (transcript of hearing).] The following witnesses testified at the hearing: (1) Detective Marcus Rakestraw with the Hogansville, Georgia, Police Department ("HPD"); (2) Detective Jeremey Jones with the LaGrange, Georgia, Police Department ("LPD"); (3) Investigator Thomas Gilliard with the Atlanta Police Department ("APD"); (4) K.H., a victim-witness to LaGrange robbery; (5) Detective Jennie Lawson, with LPD; (6) Lt. Dale Strickland with LPD; and (7) Detective Michael Young with APD.

2

Ward and Everett filed post-hearing briefs in support of their motions [Docs. 76, 77], the government has filed an omnibus response in opposition [Doc. 80], and Everett has filed a reply brief [Doc. 89].  The motions are now ripe for resolution.

## I.   Background

### A.   The October 3, 2016 Hogansville CB&T Bank Robbery

At around 4:00 p.m. on October 3, 2016, a CB&T bank branch in Hogansville, Georgia, was robbed at gunpoint.  (Hr'g Tr. at 26-27.)  Bank tellers described the robber as a black male in his late 50s or 60s, wearing a white-and-blue striped Polo shirt with a black baseball cap and black sunglasses.  (Hr'g Tr. at 27.)  Det. Rakestraw with the HPD arrived at the scene following the robbery. Witnesses did not describe any other suspects; however, an individual living on the street behind the bank reported that she observed a dark-color SUV pull behind the bank and saw two black males, one older and the other younger, get out of the vehicle.  (Hr'g Tr. at 27-28.)  The witness initially could not identify the make and model of the SUV, but, at some point, she described it as a possible new model Jeep Liberty with "shiny wheels."  (Hr'g Tr. at 27, 55.)

The day after the Hogansville robbery, October 4, 2016, Det. Rakestraw obtained and viewed the bank surveillance footage of the robbery.  (Hr'g Tr. at 30.) Using still shots of the suspect from the surveillance video, he created a "be-on-

3

the-lookout" or "BOLO" (the "HPD BOLO"), which he distributed to other law enforcement agencies, including the LPD.  (Hr'g Tr. at 31-32, 35.)  The HPD BOLO showed several pictures of the suspect and advised that the suspect "may be a black male, mid to late 20's medium height and build" and was possibly travelling in a dark-color, late-model SUV with after-market chrome spoke wheels.  (Gov't Ex. 4.)

Also on October 4, Det. Rakestraw received a BOLO issued by the Newnan Police Department (the "Newnan BOLO") that included an image of a dark-color SUV bearing the license plate QAB8270.  (Hr'g Tr. at 33-34; Gov't Ex. 5.)  The Newnan BOLO advised as follows:

> We believe that this is the vehicle that was used as a getaway vehicle in the Metro PCS Armed Robbery on 09/26/16.  The registered owner of this vehicle could be involved in the Armed Robbery, but he was not the person who robbed the business.  We believe that the suspect is the same person who has committed similar Armed Robberies at Metro Pcs stores and Subways throughout the Metro Atlanta area.  I attended a meeting this week at the Atlanta Police Department along with several Metro Police Agencies who have had similar robberies.  An agent with the FBI was in attendance, and he is now assisting In the Investigation.  According to this agent, the same suspect is believed to be responsible for the Hogansville Bank Robbery on Monday, October 3, 2016.  This is a gray 2000 Jeep Grand Cherokee.  If

4

> you see this vehicle in the area, please stop and identify
> the occupants and contact me or Lt. Washington.

(Gov't Ex. 5.)  Det. Rakestraw distributed the Newnan BOLO to all HPD officers and, on either October 5 or 6, 2016, he also advised LPD about the Newnan BOLO. (Hr'g Tr. at 35.)

## B.    The October 7, 2016 LaGrange CB&T Bank Robbery

On October 7, 2016, at approximately 2:35 p.m., a CB&T back in LaGrange, Georgia, was robbed at gunpoint.  (Hr'g Tr. at 36, 63; Gov't Ex. 65.)  Det. Jones of the LPD responded to the scene.  (Hr'g Tr. at 61.)  He interviewed K.H., a bank teller at the branch, who reported that the suspect entered the bank wearing a striped shirt, a hat, and sunglasses and asked to open an account.  (Hr'g Tr. at 62.)  K.H. told Det. Jones that she immediately recognized the suspect from bank surveillance footage received from the Hogansville branch several days earlier.  (Hr'g Tr. at 62, 131-33.)  K.H. also reported that she led the suspect into her office, and she told him that he would need to present two forms of identification to open an account. (*Id.*)  The robber replied he did not have identification, and as he was leaving, he pulled out a gun, pointed it at her, and said "This is a robbery."  (Hr'g Tr. at 62, 124.)   K.H.  had  no  trouble  seeing  the  suspect  during  the  time  that  she  was

interacting with him, and was at most four feet from the suspect when he pointed the gun at her.  (Hr'g Tr. at 124-25.)

Det. Jones related the information provided by K.H. to Sergeant Nelson, another officer present at the scene.[1]  (Hr'g Tr. at 64.)  Sgt. Nelson then related the information to other units by radio dispatch or telephone.  (*Id.*)

At around 2:50 p.m., after the robbery had been reported to authorities, Lt. Dale Strickland and Det. Adam Blaine, both with LPD, responded to the CB&T branch.  (Hr'g Tr. at 150.)  The dispatch advised that a single middle-aged black male wearing a dark hat, sunglasses, a black-and-white striped shirt, and dark pants committed an armed robbery inside the branch and that he had a dark-colored or black pistol.  (*Id.*)  Prior to the LaGrange robbery, Lt. Strickland had been in communication with GBI Special Agent Jeff Hatchett about the Hogansville bank robbery.  (Hr'g Tr. at 152.)

## C.      The October 7, 2016 Traffic Stop and Arrest of Ward and Everett

Shortly after the October 7 robbery, Det. Rakestraw heard over his radio that the suspects who robbed the LaGrange CB&T branch were possibly the same suspects who robbed the Hogansville branch.  (Hr'g Tr. at 36-37; Gov't Ex. 65.)

---

[1] Sgt. Nelson's first name was not identified at the evidentiary hearing.

6

Hogansville police officer Sergeant Rainwater took position on Interstate 85 northbound and was on the lookout for a dark green SUV matching the description of the vehicle in the Newnan BOLO.[2]  (*See* Hr'g Tr. at 37.)  At around 3:00 p.m., Sgt. Rainwater observed an SUV matching the description in the Newnan BOLO and radioed for assistance.  (Hr'g Tr. at 37, 43; Gov't Ex. 65.)  The vehicle's tag also matched the tag on the Newnan BOLO.  (Hr'g Tr. at 37-38.)  Det. Rakestraw drove to Sgt. Rainwater's location and, along with Sgt. Rainwater, performed a traffic stop on the SUV at 3:04 p.m., half an hour after the robbery occurred.  (Hr'g Tr. at 37, 41.)

Once the SUV had been stopped, Sgt. Rainwater, with his firearm drawn, directed both occupants, later identified as Ward and Everett, to exit the SUV with their hands raised above their heads.  (*See* Gov't Ex. 6 (video of traffic stop from Det. Rainwater's body camera).)  He first instructed Ward, who was driving the SUV, to walk backwards with his hands up, kneel down, and interlock his fingers on his head.  (Hr'g Tr. at 41, 43.)  Ward complied with Sgt. Rainwater's commands. (Hr'g Tr. at 41.)  Det. Rakestraw then handcuffed Ward and sent him toward the back of his patrol car.  (*Id.*)  Sgt. Rainwater issued the same commands to Everett,

---

[2] Sgt. Rainwater's first name was not identified at the evidentiary hearing.

the passenger in the SUV, and he too complied, was handcuffed, and was placed in the back of a separate patrol vehicle that arrived shortly thereafter.  (*Id.*; Gov't Ex. 6.)

After Ward and Everett were seated, handcuffed in the back of the patrol cars, Det. Rakestraw walked up to the SUV and observed that the two front windows were rolled down and that the rear windows were rolled up.  (Hr'g Tr. at 45.)  He smelled a strong odor of marijuana coming from the vehicle, and from the back windows, he could see a black baseball cap, sunglasses, a white-and-black striped shirt in the rear seat area.  (*Id.*)  The shirt caught Det. Rakestraw's attention because it matched the description of the clothing that the suspect in the LaGrange robbery was wearing.  (*Id.* at 48-49.)  Det. Rakestraw also searched Everett, finding a wallet and keycards for a Microtel hotel in Atlanta in his pocket.  (*Id.* at 49; Gov't Ex. 38.)  Det. Rakestraw passed that information to a detective in Hapeville, Georgia.  (Hr'g Tr. at 49.)

### D.   The Show-Up Identification

Back at the LaGrange bank location, K.H., the bank employee who encountered the suspect during the robbery, was asked to participate in an identification procedure, and she agreed to do so.  (Hr'g Tr. at 126.)  Det. Jennie Lawson with the LPD transported K.H. in her unmarked patrol car to the location

8

of the traffic stop along the northbound side of I-85.  (*Id.* at 127, 140.)  During the drive, Det. Lawson and K.H. did not speak to each other.  (Hr'g Tr. at 141.)

Once at the scene, Det. Lawson left her patrol car and spoke with the other officers to determine how to proceed with the identification procedure.  (Hr'g Tr. at 141-42.)  Det. Lawson then returned to her car and read K.H. the contents of the "LaGrange Police Department Show-up Viewing Form" that LPD uses.  (Hr'g Tr. at 142; *see also* Gov't Ex. 24.)  In pertinent part, the form states as follows:

> You will be advised of the procedures for viewing the field identification.  The fact that an individual is being shown to you, should not cause you to believe or guess that the guilty person(s) has been identified or arrested. This may or may not be the person who committed the crime.  You are in no way obligated to identify anyone. Regardless of whether you make an identification, the police will continue to investigate this incident.
>
> If you recognize anyone, please tell me how you recognize the individual.  We are required to ask you to state in your own words, how certain you are of any identification.

(Gov't Ex. 24.[3])  K.H. did not indicate whether she had any difficulty understanding the content of the form and she did not ask Det. Lawson any questions about what

---

[3] K.H. testified that she did not see the form until after she identified Everett and that Det. Lawson did not have it in her hand when she discussed the identification procedure with K.H. before being shown Everett and Ward.  (Hr'g Tr. at 132-33.)  The fact that K.H. may not have seen the form does not mean that

was read to her.  (Hr'g Tr. at 142.)  Det. Lawson then radioed to the other officers

to bring the suspects within a safe viewing distance of K.H.  (*Id.*)

K.H. sat in the front passenger seat of Det. Lawson's vehicle as officers

separately brought Everett and Ward to her for viewing.  (Hr'g Tr. at 128, 136.[4])

She did not recognize Ward.  (Hr'g Tr. at 128.)  But when Everett was then brought

to her, and she recognized him in a matter of "seconds" as the robber of the

LaGrange branch based on his distinct facial features, skin color, and build,

although he was wearing a different shirt than what the robber wore.  (Hr'g Tr. at

128-30.)  She did not notice whether Everett was in handcuffs.  (Hr'g Tr. at 136.)

She also did not see the shirt that the robber had worn during the robbery, although,

according to Det. Lawson, she asked to see the shirt because then she "could tell

[the officers] yes or no."  (Hr'g Tr. 136-37; Everett Ex. 9 at 3:40.)

---

Det. Lawson did not read the form to her, however, and I find it more likely that
Det. Lawson did read the form to K.H.  In any event, K.H. indisputably filed out
and signed the form, indicating, among other things, that she understood the
foregoing information.

[4] K.H. testified that officers first brought Ward, whom she did not recognize;
however the video of the encounter indicates that officers actually brought Everett
to her first.  (Hr'g Tr. at 128, 136; Everett Ex. 3.)  There is no dispute, however,
that K.H. identified Everett and did not recognize Ward.

After K.H. had identified Everett, she completed the "LaGrange Police Department Show-up Viewing Form" in which she acknowledged that she understood advice she had been given concerning the procedures for field identification. (Hr'g Tr. at 129-30.)  She also noted that she recognized the suspect based on skin color, facial features, height, weight, and build. (Gov't Ex. 24.)

### E.    The Search of the Ward's SUV

In the meantime, at around 3:11 p.m., Lt. Strickland obtained robbery surveillance footage of the LaGrange CB&T bank. (Hr'g Tr. at 152.)  He used his cell phone to take still images of the robbery suspect from the footage, which he sent to GBI SA Hatchett. (*Id.*)  Lt. Strickland also obtained printed still images from the footage, and then he and Det. Blaine headed to the traffic stop. (Hr'g Tr. at 153-54.)  While en route, SA Hatchett called Lt. Strickland and said that he was already at the scene, and that the passenger of the vehicle who had been taken into custody appeared to be the same person depicted in the surveillance video. (Hr'g Tr. at 157.)

At around 3:50 p.m. Lt. Strickland and Det. Blaine arrived at the traffic stop. (Hr'g Tr. at 155, 157.)  Upon arrival, SA Hatchett told Lt. Strickland that the two occupants of the SUV had been placed in separate police vehicles and that no one had been questioned. (Hr'g Tr. at 159.)  He also advised that there was a striped

11

shirt laying in the back seat of the SUV in plain view.  (Hr'g Tr. at 160.)  Lt. Strickland walked around the SUV and detected the odor of marijuana coming from inside the vehicle.  He could also see the striped shirt and a portion of a black hat in the backseat of the vehicle.  Det. Lawson stated that K.H. had positively identified the passenger as the person who had committed the robbery.  Lt. Strickland then searched the SUV "incident to arrest."  From the back seat, he retrieved a striped shirt, a dark-colored baseball cap, and a pair of sunglasses.  (*Id.*) Under the passenger front seat, he observed a black plastic bag containing cash, and underneath the bag was a pistol.[5]  (Hr'g Tr. at 161.)

Lt. Strickland then impounded the SUV.  Before having the vehicle towed, Lt. Strickland prepared an inventory of the vehicle.  (Hr'g Tr. at 167; *see also* Gov't Ex. 63.)  Lt. Strickland testified that he impounded the SUV pursuant to the LPD's written impound protocol.  (Hr'g Tr. at 168; Gov't Ex. 64.)  The protocol provides in pertinent part that where the driver of a vehicle has been arrested, the car may

---

[5] Lt. Strickland testified that the bag was "described in the BOLO as being what the money was placed in during the robbery at the bank."  (Hr'g Tr. at 161.) Neither the HPD BOLO nor the Newnan BOLO describe a bag; however, one of the still shots of the Hogansville robber appended to the HPD BOLO with what appears to be a black bag in his hand.  Presumably, it was this photograph that Lt. Strickland was referring to in his testimony.

be impounded when there is no one present who is authorized and capable of removing the vehicle for the protection of the vehicle and its contents.  (Gov't Ex. 64.)

### F.    Ward's Custodial Interview

Following the traffic stop, Ward was transported to the LPD, where Det. Jones and FBI Special Agent Dayne Henriques[6] interviewed him beginning at around 6:18 p.m.   (Hr'g Tr. at 76-79; Gov't Ex. 23 (videotape recording of interview).)   Ward was advised of his *Miranda* rights before the interview and executed a *Miranda* rights waiver form.  (Hr'g Tr. at 77; Gov't Ex. 22.)  Det. Jones testified that he read the form to Ward.  (Hr'g Tr. at 77.)

The interview room was average temperature.[7]  (Hr'g Tr. at 79.)   Neither Det. Jones nor SA Henriques was armed.  (*Id.*)  During the course of the interview, Ward requested a break, and he was given a break to get some water and use the restroom.  (Hr'g Tr. at 80.)  Det. Jones testified that he "may have tapped" Ward

---

[6] The transcript refers to SA Henriques as "FBI Agent Enriquez."  (Hr'g Tr. at 78.)

[7] Though Det. Jones described the room temperature as average, the video of the interview shows that Ward was chilly, and at times drew his arms inside his short-sleeve shirt.  Nonetheless, the temperature of the room did not appear to be so cold that Ward was in any appreciable amount of discomfort.

on his leg during the interview, but he denied causing any "actual harm."  Dr. Jones may have also raised his voice once or twice during the interview.  Ward was not handcuffed, but he was in leg irons to keep him from leaving the room.  (*Id.*)

At the beginning of the interview, Ward was forthright and willing to talk. (Hr'g Tr. at 80.)  He appeared to understand the questions asked of him, he had no difficulty responding to the questions.  (Hr'g Tr. at 81.)  But as the interview proceeded, he became increasingly nervous.  (Hr'g Tr. 80-82.)  Det. Jones told Ward that "it would be in his best interest for him to tell us the truth and tell us what really went on."  (Hr'g Tr. 81.)  Det. Jones believes that he also offered to share statements that Ward made with prosecutors and that there was "some talk" about how Ward needed to think about what was best for him and his family.  (Hr'g Tr. at 81-82.)  SA Henriques also spoke during the interview, including about the impact that incarceration could have on Ward's family.  (Hr'g Tr. at 82.)  During the interview, Det. Jones falsely told Ward that Everett had stated that Ward was the one who planned the robbery and was the "brain behind the robbery."  (Hr'g Tr. at 83.)  The interview ended when Ward "said that he didn't want to talk anymore and wanted an attorney."  (Hr'g Tr. at 82.)

14

### G.   The Unexecuted GPS Tracking Warrant

On October 5, 2016, Investigator Thomas Gilliard of the APD obtained a warrant to install a tracking device on the SUV that was driven by Everett.  (Hr'g Tr. at 110-111; Everett Ex. 16.)   Investigator Teague[8] with the Department of Homeland Security was going to install the tracker; however, before he was able to do so, the vehicle was stopped and Ward and Everett were apprehended.  (Hr'g Tr. at 110, 114-15.)  Thus, the GPS tracker was not installed on the vehicle.

Investigator Gilliard testified that he advised his supervisor, Sergeant Anthony Gentile and his colleague Investigator Willie Towns that he had secured the tracking warrant.  (Hr'g Tr. at 116-17.)

On October 7, 2016, Detective Michael Young with the APD obtained a search warrant from a Magistrate in Fulton County, Georgia authorizing the search of the Microtel hotel room in which Everett was allegedly staying.  (Everett Ex. 17.)  In his affidavit in support of the search warrant application, Det. Young stated, in pertinent part, that "Everett was working with a partner whose role was to be the get-a-away [sic] driver.  After investigators identified the get-a-away [sic] driver,

---

[8] Investigator Teague's first name was not identified during the evidentiary hearing.

they put a GPS tracker on the car until another robbery was committed." (*Id.*) Det. Young testified that he based that statement in information that he would have received from Det. Gilliard, Sgt. Gentile, or Det. Towns, when they called Det. Young and asked him to prepare the search warrant. (Hr'g Tr. at 121.) The search warrant was not executed. (*Id.* at 112.)

## II.     Defendants' Motions Challenging the GPS Trackers [Docs. 39, 42]

Defendants move to suppress any evidence derived from a GPS tracker. [Docs. 39, 42.] The evidence of record shows that although APD obtained a tracking warrant for Ward's vehicle on October 5, 2016, the tracking device was not installed before the October 7, 2016 traffic stop and arrests. Because the government did not obtain any evidence as a result of that warrant, there is no evidence that would be subject to suppression. Accordingly, it is **RECOMMENDED** that Ward's Motion to Suppress GPS Tracker [Doc. 39] and Everett's Motion to Suppress Evidence From GPS Tracker and Fruits of the Unconstitutional Use of the Tracking Device [Doc. 42] be **DENIED AS MOOT**.

## III.    Defendants' Motions to Suppress Evidence Seized in Connection With the Traffic Stop [Docs. 38 and 43]

Ward and Everett move to suppress evidence resulting from the warrantless stop of Ward's SUV, their arrests, the search of Everett's person at the traffic stop,

and the search of the SUV.  For the reasons that follow, these motions should be denied as, based on the totality of the evidence, law enforcement had probable cause to believe that Ward and Everett had committed the LaGrange bank robbery. In addition, because Everett's warrantless arrest was supported by probable cause, the warrantless search of his person following his apprehension was a proper search incident to arrest and did not violate the Fourth Amendment.  Likewise, the search of the SUV was constitutionally permissible under the automobile exception and inventory search exceptions to the warrant requirement.

### A.    The Traffic Stop and Arrests

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "There are three broad categories of police-citizen encounters for purposes of [a] Fourth Amendment analysis: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests."  *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006).  Here, the government argues that Det. Rakestraw and Sgt. Rainwater "acted with probable cause" in stopping the SUV under the automobile exception to the warrant requirement.  [Doc. 80 at 17-21.]  The Court

agrees that the stop was lawful, but because officers had probable cause to arrest the occupants of the SUV.

Probable cause to make a warrantless arrest exists when, at the moment of arrest, the facts and circumstances within the collective knowledge of the officers involved are sufficient to warrant a prudent person in believing a person has committed an offense or will commit an offense. *Michigan v. De Fillippo*, 443 U.S. 31, 37 (1979); *United States v. Blasco*, 702 F.2d 1315, 1324 (11th Cir. 1983). "'Probable cause' defines a radically different standard than 'beyond a reasonable doubt,' and while an arrest must stand on more than suspicion, the arresting officer need not have in hand evidence sufficient to obtain a conviction." *Von Stein v. Brescher*, 904 F.2d 572, 578 n.9 (11th Cir. 1990) (quoting *United States v. Pantojo-Soto*, 739 F.2d 1520 (11th Cir. 1984)). "The existence of probable cause to arrest is based on objective standards." *Id.* at 578. Probable cause "deal[s] with probabilities . . . [which] are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

Viewing the totality of the circumstances, the Court concludes that, at the outset of the traffic stop, officers had probable cause to arrest Everett and Ward. Before the traffic stop, law enforcement officers had received considerable information linking the SUV and its occupants to the October 7, 2016 LaGrange robbery. On October 4, 2016, three days before the traffic stop and arrest, Det. Rakestraw learned from the GBI that there were suspects fitting the description of the individuals who were involved in the Hogansville robbery who had been involved in approximately 15 armed robberies in the Atlanta metropolitan area. (Hr'g Tr. at 33.) Det. Rakestraw also received a BOLO from the Newnan Police Department advising that a gray 2000 Jeep Grand Cherokee bearing license plate number QAB8270 had been used as a getaway car in multiple armed robberies in the metropolitan Atlanta area, and was believed to have been in involved in the October 3, 2016 robbery of the Hogansville branch. (Hr'g Tr. at 34; Gov't Ex. 5.) Det. Rakestraw passed the Newnan BOLO out to all the HPD patrol officers, and on either October 5 or 6, also shared the BOLO with LPD. (Hr'g Tr. at 35.) Det. Rakestraw was also aware that an eyewitness identified a dark-colored, late-model Jeep Liberty in connection with the Hogansville robbery and reported that two

19

black males, one younger and one older, got out of the vehicle.  (Hr'g Tr. at 27, 55.)

On October 7, 2017, Troup County dispatch advised that the CB&T branch had been robbed, and based on the radio traffic, Det. Rakestraw understood that the perpetrators possibly were the same suspects who had committed the October 3 robbery in Hogansville.  (Hr'g Tr. at 36-37.)  Specifically, the dispatch advised that one of the tellers in the LaGrange branch reported that the robber was the same person depicted in photographs from the Hogansville robbery.  (Hr'g Tr. at 38.)  Also before the traffic stop, Det. Rakestraw spoke with GBI SA Hatchett, who stated that LPD told him that the suspects in the Hogansville robbery were the same ones they suspected in the LaGrange robbery.  (Hr'g Tr. at 48.)

Sgt. Rainwater, whom Det. Rakestraw testified had also heard the dispatch and was aware of the Newnan BOLO, moved into position on I-85 northbound, and around 15 minutes later radioed that he saw the SUV.  (Hr'g Tr. at 37.)  Det. Rakestraw then went to Sgt. Rainwater's location, and they pulled the SUV over.  (*Id.*)  The SUV matched the description on the Newnan BOLO and bore the same license tag.  (*Id.* at 38.)  Moreover, the SUV was driving where police believed it could be found as the suspects fled the LaGrange robbery, and it was spotted half

20

an hour after the robbery.  Given all these circumstances, Det. Rakestraw and Sgt. Rainwater had probable cause to believe the occupants of the SUV had committed the robbery, and therefore had probable cause for the warrantless arrests.

Defendants raise several arguments in support of their assertion that there was no probable cause for the traffic stop; however, none has merit.

Ward argues that Sgt. Rainwater's knowledge with respect to the traffic stop is unknown, since Sgt. Rainwater did not testify, and there is no report of his account of the facts and circumstances of the traffic stop and arrest.  [Doc. 76 at 16-19.]  It is unnecessary for purposes of the present analysis, however, to know how precisely how Sgt. Rainwater perceived the situation because the Court must decide whether probable cause existed on an objective basis, "without regard to the subjective beliefs of law enforcement officers, whatever those beliefs may have been."  *Craig v. Singletary*, 127 F. 3d 1030, 1042 (11th Cir. 1997); *see also Whren v. United States*, 517 U.S. 806, 813-14 (1996) ("Subjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis.").  Under the collective knowledge doctrine, it is appropriate to consider the knowledge of other law enforcement officers, and not just Sgt. Rainwater's knowledge in a vacuum.  *See United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) (citing *Blasco*, 702

F.2d at 1324, and noting that a court may consider the "collective knowledge" of law enforcement officers "if they maintained at least a minimal level of communication during their investigation"). Det. Rakestraw testified that Sgt. Rainwater had been advised of the Newnan BOLO and had heard the radio dispatch on the afternoon of October 7 following the LaGrange robbery. In addition, Det. Rakestraw participated in the traffic stop with Sgt. Rainwater and the two of them were in communication at all material times. Accordingly, the lack of testimony from Sgt. Rainwater about his perceptions relating to the traffic stop provides no basis for suppression.

Ward next argues that the government cannot show probable cause for the arrest because Det. Rakestraw testified that the car matched the "dark green SUV" description of the Newnan BOLO, but that BOLO described the vehicle as "gray." [Doc. 76 at 18.] Ward also contends that although Det. Rakestraw testified that the tag number matched the one on the Newnan BOLO, he did not explicitly recite what the tag numbers on the car or the BOLO were. [*Id.*] He additionally maintains that Det. Rakestraw could not link the SUV to the Hogansville robbery because the witness from the Hogansville robbery described the get-away vehicle as a newer model dark green Jeep Liberty with shiny wheels, whereas Ward's

22

vehicle was an older-model Jeep Grand Cherokee with factory wheels. [*Id.* at 18-19.] Based on the totality of the circumstances, the Court cannot agree that these inconsistencies are fatal to a finding of probable cause. The vehicle that Det. Rakestraw and Sgt. Rainwater pulled over was clearly identical to the one depicted in the Newnan BOLO—in make, model, color, tag number, and window stickers. Although the witness from the Hogansville robbery described a different model with different wheels, her description was generally consistent in that she described the getaway vehicle as a dark-colored SUV, and at some point described the vehicle as a dark-colored Jeep. Finally, it was unnecessary for Det. Rakestraw to have recited at the evidentiary hearing the tag numbers on the Newnan BOLO and the SUV, as it apparent from the record that the numbers were identical and that Det. Rakestraw recognized this.

Ward also argues that the testimony regarding the GPS tracker was not credible, and "casts a shadow of unreliability upon the entire testimony" of the government's witnesses. [Doc. 76 at 21.] Although the Court is troubled that the warrant application to search the Microtel hotel room that APD prepared erroneously stated that a GPS device had been attached to the SUV, it cannot be said that that error infected the entire investigation. The APD officers involved in

obtaining that warrant had no involvement in the events leading up to the traffic stop, arrest, interrogation, or show-up at issue in this case.  In addition, that warrant was not executed.  Simply put, the Court finds no reason to discount the credibility of the Hogansville and LaGrange law enforcement officers who testified at the hearing.

Everett argues that "[a]t best the car was 'possibly' associated with the Newnan robbery a week prior, for which Newnan [Police Department] had no arrest warrant and merely requested in their BOLO that the car be stopped and the occupants identified." [Doc. 77 at 13.]  But the Newnan BOLO was not the only source of information linking the SUV and its occupants to the LaGrange robbery. Moreover, an officer is not required is required to resolve all inferences and all factual conflicts in favor of the suspect. *Bailey v. Bd. of Cty. Comm'rs*, 956 F.2d 1112, 1119 n.5 (11th Cir. 1992).  As explained above, before officers pulled the SUV over, they were aware of the Newnan and HPD BOLOs; that a witness had identified a vehicle nearly matching the SUV as a the getaway vehicle from the Hogansville robbery; that a robbery had just occurred at another CB&T branch; and that the description of the robber matched the description of the Hogansville robber.  On these facts, it is reasonable to infer that the SUV was being used as the

getaway vehicle from the LaGrange robbery, and officers had probable cause to arrest the SUV's occupants.

Finally, Ward argues that he was not identified in the show-up identification, which undermines the existence of any probable cause or reasonable suspicion that may have existed before the show-up. [Doc. 76 at 21.] The Court disagrees. While there may not have been probable cause to believe that Ward was the individual who physically entered the CB&T branch in LaGrange, there was other information that created probable cause to believe that he was involved in the crime. As discussed above, following the Hogansville branch robbery, a witness reported seeing two black males, one older and one younger, get into a Jeep; Ward was driving the Jeep that matched the Newnan BOLO; and the passenger in Ward's vehicle appeared to be the robbery suspect. Viewing the totality of the circumstances, the officers possessed strong evidence linking Everett and Ward to the LaGrange robbery.[9]

_____

[9] The government alternatively argues that the stop was supported by reasonable suspicion, and probable cause developed during Ward and Everett's lawful detention. [Doc. 80 at 26-29.] Even assuming, *arguendo*, there was any doubt that officers had probable cause for the warrantless arrest at the outset of the traffic stop, the officers had reasonable suspicion to conduct an investigative stop of the SUV in light of all the circumstances explained above. *See Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) ("The Fourth Amendment permits brief

**B.      The Search of Everett's Person**

Everett also challenges the search of his person and the resulting seizure of his wallet, phone, and hotel keycards.  [Doc. 77 at 14; Doc. 89 at 5.]  But, since the arrest was supported by probable cause, he could lawfully be searched incident to arrest.  *See United States v. Robinson*, 414 U.S. 218, 224 (1973); *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985).  Accordingly, no constitutional violation occurred when Everett's person was searched.

---

investigative stops—such as the traffic stop in this case—when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity."); *see also United States v. Chanthasouxat*, 342 F.3d 1271, 1275 (2003) (noting that a traffic stop is constitutional if based upon either probable cause to believe a traffic violation has occurred or reasonable suspicion in accordance with *Terry v. Ohio*, 392 U.S. 1 (1968)).  That reasonable suspicion quickly crystalized into probable cause when officers observed that the SUV's occupants matched the description of the suspects from the Hogansville robbery—two black males, one older and the other younger.  (Hr'g Tr. 27-28.)  The fact that officers had their guns drawn and handcuffed the occupants of the car at the outset of the stop was not, by itself, enough to transform the stop into an arrest.  *See United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995) (officers did not transform an investigatory stop to an arrest by asking armed robbery suspects to leave an apartment and handcuffing them once outdoors); *United States v. Kapperman*, 764 F.2d 786, 790 n.4 (11th Cir. 1985) ("Police may take reasonable action, based upon the circumstances, to protect themselves during [*Terry* stops], or to maintain the status quo.").

C.     **The Warrantless Search of Ward's SUV**

1.     **The Search Was Permissible Under the Automobile Exception to the Warrant Requirement.**

The government argues that Lt. Strickland's search of Ward's SUV was permissible because probable cause existed to believe that the vehicle contained evidence of a crime based on the collective knowledge of law enforcement officers. [Doc. 80 at 31-32.]  The Court agrees.

Under the automobile exception to the warrant requirement, law enforcement may conduct a warrantless search of a vehicle if (1) it is readily mobile and (2) law enforcement has probable cause for the search.  *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007).   A vehicle is "readily mobile" if it is operational.  *Id.*  The search of a vehicle need not occur contemporaneously with its lawful seizure.   *Id.* (citing *United States v. Johns*, 469 U.S. 478 (1985)). Probable cause exists for a search where, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle.  *Id.*

Here, there is no dispute that the SUV was operational and therefore readily mobile.  Likewise, probable cause existed to believe that the vehicle contained contraband or evidence of a crime, including the fruits of the bank robbery that

27

occurred less than an hour before the traffic stop.  In addition to the facts giving

rise to probable cause to justify the vehicle stop and arrests of Ward and Everett,

Lt. Strickland observed that the shirt worn by the LaGrange robber was in plain

view in the rear seat of the SUV, K.H. had identified Everett as the armed robber,

and there was a strong odor of marijuana coming from the vehicle.[10]  Considering

the totality of the circumstances, there was a fair probability that evidence of a

crime would be found in the vehicle.  Accordingly, law enforcement had probable

cause to believe that the vehicle contained evidence of a crime, and, therefore,

lawfully searched the SUV without a warrant.

---

[10] Everett maintains that Lt. Strickland and Det. Rakestraw's assertion that they smelled marijuana is incredible because no marijuana was listed on the inventory of the vehicle or evidence reports.  Perhaps if only one officer had reported the odor of marijuana, Everett's argument would be more persuasive; however, the fact that two officers reported the smell is indicative that they, in fact, believed that they smelled marijuana.  (*See* Hr'g Tr. at 45, 160.)  Moreover, both Lt. Strickland and Det. Rakestraw testified as to their experience with marijuana.

Everett additionally points out that there was some inconsistency in the officers' testimony concerning the precise location of the shirt, hat, and sunglasses. [Doc. 77 at 14.]  For example, Det. Rakestraw testified that the striped shirt was "wadded up in the floorboard" whereas Lt. Strickland testified that he saw the shirt on the back seat of car, with the sunglasses and hat protruding from underneath. (Hr'g Tr. at 49, 160.)  These inconsistencies are immaterial as there is no dispute that the shirt, sunglasses, had were in plain view in the rear seat area of the vehicle.

### 2. Law Enforcement Properly Impounded the SUV and Performed a Lawful Inventory

The government also convincingly argues that Lt. Strickland lawfully impounded the SUV and conducted a valid inventory.

The Supreme Court has also held that inventories conducted pursuant to an established procedure on legally impounded vehicles are valid under the Fourth Amendment, even without a warrant. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987); *South Dakota v. Opperman*, 428 U.S. 364, 372-73 (1976); *see also United States v. Joseph*, 611 F. App'x 946, 948 (11th Cir. 2015). "If a search is to be upheld under the inventory search doctrine . . . the police must first have the authority to impound the vehicle and must then follow the procedures outlined in the policy." *United States v. Williams*, 936 F.2d 1243, 1248 (11th Cir. 1991). The government bears the burden of demonstrating standardized criteria or an established routine that governs the inventory search and that the officers conducting the search complied with departmental policy. *See Florida v. Wells*, 495 U.S. 1, 4 (1990); *Sammons v. Taylor*, 967 F.2d 1533, 1543 (11th Cir. 1992).

Here, the LPD maintains a written impound and inventory policy. (*See* Gov't Ex. 64.) The policy provides in pertinent part that officers may impound a vehicle for the protection of the vehicle and its contents where the driver has been

29

arrested and there is no one present who is authorized and capable of removing the vehicle.  (*Id.* at § III.A.4.a.)  It further provides that any time a vehicle is impounded, a LaGrange Police Department Automobile Inventory Report must be completed.  (*Id.* § III.C.)

The Court readily concludes that Lt. Strickland properly impounded the SUV under the policy, as both the driver of the SUV (Ward) and the sole passenger (Everett) were arrested and no one else was available at the scene who could drive the SUV away.  In addition, Lt. Strickland completed an inventory sheet for the vehicle and affirmatively testified that he followed the policy in this case.  (Hr'g Tr. at 167, 169; Gov't Ex. 63.)  Based on this record, the Court concludes that the warrantless search of the SUV should also be upheld as a constitutional inventory search.

### D.    Summary

In sum, the Court concludes that based on the totality of the circumstances, the initial traffic stop and the arrests of both defendants were supported by probable cause that they had committed the robbery of the LaGrange CB&T bank branch. Thus, the warrantless stop and arrest were not unreasonable under the Fourth Amendment.  In addition, because probable cause existed for Everett's arrest, the search of his person incident to arrest was constitutional as well.  Finally, under the

30

automobile exception and the inventory search exceptions, the search of Ward's SUV was constitutional.  Accordingly, it is **RECOMMENDED** that Defendants' Motions to Suppress Evidence [Docs. 38 and 43] be **DENIED**.

**IV.    Everett's Motion to Suppress Identification [Doc. 41]**

The Eleventh Circuit has adopted a two-part analysis to determine whether an out-of-court identification procedure violates due process.  First, the Court considers whether the identification procedure was unduly suggestive.  *United States v. Diaz*, 248 F.3d 1056, 1102 (11th Cir. 2001).  If the Court concludes that the identification procedure was not unduly suggestive, then the inquiry ends.  If, however, the Court concludes that it was unduly suggestive, then the Court considers whether, under the totality of the circumstances, the identification was nevertheless reliable.  *Id.*  The Supreme Court has identified factors the Court should consider to determine the reliability of an identification, including:  (1) the opportunity the witness had to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.  *Id.* (citing *Neil v. Biggers*, 409 U.S. 188 (1972)).

Everett argues that the show-up was highly suggestive because K.H. was driven to the scene of the vehicle stop, Ward and Everett were handcuffed and escorted to the viewing location by law enforcement officers, and K.H. was surrounded by numerous police vehicles with flashing lights. [Doc. 77 at 18.] The Court disagrees.  Everett cites no cases that have held that a police officer's transporting a witness to the scene aggravates the suggestiveness of the identification procedure.  To the contrary, the Eleventh Circuit has held that an identification procedure was not unduly suggestive where the police drove the victim the location of the arrest.  *See United States v. Winfrey*, 403 F. App'x 432, 436 (11th Cir. 2010) (victim transported to scene of arrest for show-up identification); *Johnson v. Dugger*, 817 F.2d 726, 728 (11th Cir. 1987) (witness to bank robbery driven to location of arrest for show-up); *see also United States v. Caldwell*, No. 1:16-CR-355-MHC-JSA, 2017 WL 6343310, at *2 (N.D. Ga. Dec. 11, 2017) (witness to bank robbery transported by detective to where defendant was being detained after his arrest); *accord United States v. Fouche,* 8 F.3d 31 (9th Cir. 1993) (holding show-up not unduly suggestive where police transported bank tellers to where defendant was detained).  Likewise, the fact that Everett was in handcuffs at the time and that the area was surrounded by police officers does not

make the identification unduly suggestive.  *See United States v. Walker*, 201 F. App'x 737, 741 (11th Cir. 2006) (rejecting argument that identification was unduly suggestive where suspect was surrounded by police and presented to the witness alone and in handcuffs, which were unseen by the witness).  Indeed, one would reasonably expect that law enforcement officers would be present at the scene and that suspects who had just been apprehended would be in handcuffs.  *See United States v. Moore*, No. 12-20256-CR, 2013 WL 183869, at \*4 (S.D. Fla. Jan. 17, 2013) (concluding that show-up identification procedure was not unduly suggestive where suspect was in handcuffs and had just been apprehended).  Nor did law enforcement made any suggestive statements to K.H. prior to the identification. While en route to the scene of the stop, Det. Lawson did not speak to K.H., and once they arrived, Det. Lawson advised K.H. of the procedure and that she would have to fill out a form stating how confident she was with the identification.  (Hr'g Tr. at 128, 132, 141-42.)  For these reasons, the Court concludes that the show-up was not unduly suggestive.

Even if the show-up were unduly suggestive, the identification was sufficiently reliable, considering the relevant factors.  First, K.H. had sufficient opportunity to view the robber at the time of the robbery.  K.H. was in the

33

immediate presence of and directly interacted with the robber for at least a minute and a half, and during that time, she had no trouble seeing him.  (Hr'g Tr. at 123-24; Everett Ex. 5.)  Everett points out that K.H. testified that the entire encounter felt like it lasted for minutes, but that the surveillance footage shows that only around ninety seconds passed.  [Doc. 89 at 8-9.]  To the extent that Everett insinuates that K.H.'s testimony is inconsistent with the video footage and that her credibility should be questioned, the Court disagrees.  K.H. testified that it "felt" like she interacted with the robber for "minutes."  (Hr'g Tr. at 124.)  She did not testify as to how long the event actually lasted.  Indeed, as a matter of common sense, it is not surprising that K.H. may have felt that the episode lasted longer than it really did.  In any event, given her direct interaction with the robber, the Court has no reservation concluding that K.H. had ample opportunity to view the robber.

Second, K.H. paid close attention to the robber.  She encountered him as he entered the branch lobby, spoke with him about opening an account, and led him into her office, and then as he was leaving her office to head back out into the lobby, he pulled out the gun.  (Hr'g Tr. at 124-25.)  Everett argues that K.H.'s reliability is diminished because "was also in fear and aware of the presence of a gun, which draws the eye away from observing the person holding it."  [Doc. 77 at 18.]  But

K.H. had ample opportunity to interact with the robber ***before*** he pulled the gun. Thus, even if the presence of the gun may have drawn K.H.'s attention from the robber's face, she still had time to view him.

Third, K.H. accurately described the robber before the identification procedure. Det. Jones testified that K.H. reported that as soon as the robber entered the bank, she recognized him as the individual who had robbed the Hogansville branch just days before. (Hr'g Tr. at 62.) She described him as wearing a striped shirt, sunglasses, and a hat. (*Id.*) At the vehicle stop, a striped shirt, sunglasses, and hat were recovered from the SUV. *See United States v. Rodger*, 521 F. App'x 824, 831 (11th Cir. 2013) (finding that show-up was sufficiently reliable where, among other things, eyewitnesses described the robber as wearing a dark-color jacket, skull cap, and sunglasses, and when the defendant was captured, police recovered a blue jacket, skull cap, and sunglasses from his car).

Fourth, K.H. demonstrated a high level of certainty at the show-up that Everett matched the description of the robber. She stated that she identified him in "seconds" due to his "distinct facial features, skin color, and build." (Hr'g Tr. at 128-29.) She also indicated on the show-up form that her level of confidence was "the skin color, and factual features from the cheek bones down are correct. The

height, weight & build is correct." (Gov't Ex. 24.) And, fifth, the identification occurred less than an hour and a half after the robbery, so K.H.'s memory was still fresh. *Rodger*, 521 F. App'x at 831 (concluding that eyewitnesses' memories "were still fresh" where identification procedure was conducted less than two hours after robbery).

Everett argues that her level of confidence is questionable because K.H. asked to "see the shirt" because "if [she] could see the shirt [she] could tell you yes or no." (Everett Ex. 9 at 3:40.) The Court disagrees. Even if K.H. would have been even more certain if she had been allowed to see additional evidence linking Everett to the crime, she still expressed a high degree of certainty that Everett was the person who robbed the LaGrange bank based solely on his physical features. Moreover, as a practical matter, the officers should not be faulted for not showing K.H. the shirt because, had she been permitted to also view evidence, that would have arguably increased the suggestiveness of the procedure.

Finally, Everett argues that the government did not ask K.H. to identify the robber during the evidentiary hearing and, therefore, it is impossible to know how accurate her recollection was after the robbery. [Doc. 77 at 19.] Everett cites no authority that K.H.'s identification at the evidentiary hearing itself would have any

bearing on the reasonableness of the show-up itself, which occurred nearly a year before the hearing.

In sum, the show-up was not unduly suggestive, and, in any event, the identification was not unreliable.  Thus, it is **RECOMMENDED** that Everett's Motion to Suppress Identification [Doc. 41] be **DENIED**.

## V.    Ward's Motion to Suppress Statement [Doc. 40]

Ward makes no argument in his post-hearing brief that his statements to Det. Jones and FBI SA Henriques during his interview at the LaGrange Police Department were made involuntarily or in violation of *Miranda*.  Thus, the Court may deem this motion abandoned, and deny it on that basis.  *See United States v. Gutierrez-Martinez*, No. 1:12-CR-256-RWS-JSA, 2013 WL 1694065, at *3 (N.D. Ga. Mar. 22, 2013) (deeming unperfected motions to suppress abandoned), *report and recommendation adopted*, 2013 WL 1694058 (N.D. Ga. Apr. 17, 2013); *United States v. Coleman*, No. 1:07-CR-233-ODE-RGV, 2010 WL 11507843, at *8 n.16 (N.D. Ga. Feb. 24, 2010) (deeming motion to suppress statements abandoned where defendant did not address issues in post-hearing brief), *report and recommendation adopted*, 2010 WL 11515338 (N.D. Ga. May 18, 2010). Nonetheless, even if Ward had continued to argue that his statements should be suppressed, the motion would fail.

The Fifth Amendment provides that "no person shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  In *Miranda v. Arizona*, the Supreme Court created a presumption that evidence produced by custodial interrogation of a suspect is coerced unless the suspect is first advised of his constitutional right to remain silent and to have an attorney present during any questioning.  384 U.S. 436, 444-45 (1966).

A suspect may waive his Fifth Amendment privilege provided that he does so "voluntarily, knowingly, and intelligently."  *Miranda*, 384 U.S. at 444.  This inquiry is twofold:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (internal quotation marks and citations omitted).   Ultimately it must be shown, by reference to the totality of the circumstances, that the defendant's statement was "the product of an essentially

free and unconstrained choice." *Parker v. Allen*, 565 F.3d 1258, 1280 (11th Cir. 2009) (quoting *Hubbard v. Haley*, 317 F.3d 1245, 1252-53 (11th Cir. 2003)).

The recorded interview and the testimony of Det. Jones amply demonstrate that Ward knowingly, voluntarily, and intelligently waived his *Miranda* rights. The evidence of record shows that Ward was transported to the LaGrange Police Department, where he was placed in an interview room. (Hr'g Tr. at 79.) Shortly thereafter, Det. Jones and SA Henriques entered the room and engaged in some conversation with Ward, generally asking questions about his background.[11]  After approximately six minutes, Ward expressed confusion as to why he had been pulled over, stated that he wished to talk, and asked if he needed a lawyer. (Gov't Ex. 23 at 6:30-58.) Det. Jones responded that because Ward had been detained and was not free to leave, Ward would have to be advised of his *Miranda* rights before he could be questioned in depth. (*Id.* at 7:17-24.) Det. Jones then read Ward his *Miranda* rights from an LPD waiver-of-rights form, and Ward indicated that he understood those rights and wished to speak. (*Id.* at 8:00-30.) Ward then signed

---

[11] Ward does not identify any incriminating statements or responses to questions he made during his pre-*Miranda* questioning that he believes should be suppressed. In any event, administrative questions do not qualify as interrogation and are therefore except from *Miranda*. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990).

the form, indicating that he read the statement, understood his rights, that he was willing to make a statement or to answer questions, that he did not want a lawyer at that time, that he knew what he was doing, that no promises or threats had been made to him, and that no pressure or coercion of any kind had been used against him.  (Gov't Ex. 22.)  He also indicated that he was not presently under the influence of any medication, illegal drugs, or alcohol.  (*Id*.)  During the interview itself, which lasted approximately an hour, Ward was not threatened or coerced. Finally, once Ward asked to consult with a lawyer, the interview stopped.

Considering the totality of the circumstances, Ward voluntarily, knowingly, and intelligently waived his *Miranda* rights.  It is therefore **RECOMMENDED** that the motion to suppress be **DENIED**.

## VI.   Conclusion

For the foregoing reasons, it is **RECOMMENDED** that:

(1) Ward's Motion to Suppress GPS Tracker [Doc. 39] and Everett's Motion to Suppress Evidence From GPS Tracker and Fruits of the Unconstitutional Use of the Tracking Device [Doc. 42] be **DENIED AS MOOT**; and

(2) Ward's Motion to Suppress Stop, Seizure, and Search of Vehicle and Evidence Seized [Doc. 38], Ward's Motion to Suppress Statement [Doc. 40],

Everett's Motion to Suppress ID Evidence [Doc. 41] and Everett's Motion to Suppress Evidence [Doc. 43] be **DENIED**.

Also pending before the Court is Ward's *pro se* Motion for Bond.  [Doc. 62.] The Court does not consider *pro se* motions by parties who are represented by counsel.  LCrR 57.1(D)(3), NDGa.  Since Ward has not applied for nor received permission to file any motions *pro se*, it is **ORDERED** that his Motion for Bond be **DENIED**.

There are no matters pending before me for these defendants, and I have not been advised of any impediments to the scheduling of a trial.  Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

IT IS SO ORDERED and RECOMMENDED this 30th day of March, 2018.

_____
JOHN K. LARKINS III
United States Magistrate Judge

41