IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>WILLIAM ANTHONY EVERETT and<br>MARCUS LAMONT WARD<br><br>      Defendants. | CRIMINAL ACTION FILE NO.<br><br>1:17-CR-020-RWS-JKL |

## FINAL REPORT AND RECOMMENDATION

Pending before the Court are Defendant William Anthony Everett's Motion to Suppress Eyewitness Identifications [Doc. 116], Motion to Dismiss 924(c) Counts [Doc. 117], and Motion to Dismiss Enhanced Penalty in Count 4 [Doc. 125.] For the reasons discussed below, it is **RECOMMENDED** that these motions be **DENIED**.

## I.    Procedural History

On January 17, 2017, a federal grand jury seated in the Northern District of Georgia returned a five-count indictment against Everett and co-defendant Marcus LaMont Ward, charging Everett with two counts of armed bank robbery, two corresponding charges of brandishing a firearm during the robberies, and one count

of possession of a firearm by a convicted felon.[1]  [Doc. 1.]  Everett filed several pretrial motions to suppress [Docs. 41, 42, 43], which this Court ruled on [Docs. 90, 101.].

On July 10, 2018, the government obtained a seventeen-count superseding indictment against Everett and Ward.  [Doc. 103.]  Everett is now charged with one count of conspiracy to commit Hobbs Act robbery, 18 U.S.C. § 1951(a) (Count One), two counts of armed bank robbery, 18 U.S.C. § 2113(a) and (d) (Counts Two and Five), seven counts of Hobbs Act Robbery, 18 U.S.C. § 1951(a) (Counts Seven, Eight, Ten, Twelve, Fourteen, Sixteen, and Seventeen), six counts of brandishing a firearm during a crime of violence, 18 U.S.C. § 924(c) (Counts Three, Six, Nine, Eleven, Thirteen, and Fifteen), and one count of possession of a firearm by a felon, 18 U.S.C. § 922(g)(1) (Count Four).  [*Id.*]

Everett has filed three pretrial motions.  First, he moves to suppress two out-of-court eyewitness identifications by a cashier and store manager of a Dollar General store that Everett allegedly robbed at gunpoint.  Second, he moves to dismiss the § 924(c) charges.  Third, he moves to dismiss the felon-in-possession

---

[1] Ward was charged with one count of armed bank robbery and one count of brandishing a firearm during the robbery.  [Doc. 1 at 2-3.]  He did not file any additional pretrial motions following the return of the superseding indictment.

charge to the extent that it would trigger the ACCA sentencing enhancement in § 924(e).

On March 29, 2019, the Court held an evidentiary hearing on the motion to suppress the eyewitness identifications.  [Docs. 143 to 145 (exhibits); 151 (transcript).]  Sergeant Phillip Stroud, Officer Keith Todman, and Detective Joseph Morgan, all of the Kennesaw Police Department, testified at the hearing.  Following the hearing, the government moved to supplement the record to include additional disciplinary records related to Officer Todman, which the Court granted.  [Docs. 149, 157.]  Everett has filed a post-hearing brief in support of his motion [Doc. 161], the government has filed a response [Doc. 164], and Everett has filed a reply [Doc. 166].

The Court first addresses the motion to suppress, and then turns to the motions to dismiss.

## II.    Motion to Suppress Identification [Doc. 116]

### A.    Background

The identification at issue in Everett's motion to suppress occurred two months after the August 14, 2016 robbery of a Dollar General store in Kennesaw, Georgia.  Two witnesses separately identified Everett as the robber in photo lineup procedures.  In discussing the facts of the robbery, the Court relies primarily on

3

Government's Exhibit 1, which consists of surveillance video from inside the Dollar General store during the time of the robbery.  Where possible, the Court cites the exact timestamps from the surveillance video.  The Court also relies on the testimony at the evidentiary hearing, cited as "Tr.", and the government's other exhibits admitted at the hearing, cited as "Gov't Ex."  After setting out the facts of the robbery, the Court discusses the general procedures applicable to the photo lineups here and then describe the identification procedures that the Kennesaw Police Department actually used with the two witnesses.

### 1.    The Dollar General Robbery

The robbery occurred at the L-shaped checkout counter positioned near the entrance to the Kennesaw Dollar General.  (Tr. 4.)  On the short side of the "L," which abutted a wall, there was one cash register.  The short side of the "L" was close to the door.  The long side of the "L" ran parallel to the wall, partially enclosing the checkout area.  The other end of the checkout area was open to the store.  At the time of the robbery, only one cashier was working at the checkout counter, at the cash register close to the door.  The store manager went outside through the door to gather shopping carts at 8:51:50 p.m.  (Gov't Ex. 5 [Doc. 144-1 at 6-7].)

4

The robber—an African-American man wearing a hat or other head covering, sunglasses, a white shirt with dark trim, and dark pants—entered the store at 8:56:10 p.m.  He walked past the checkout area at 8:56:17 and walked briefly through the store.  At 8:58:28, he walked through the open end of the checkout area.  The cashier was facing the door while restocking plastic bags and could not see the robber's approach.  The robber walked up behind the cashier and placed a gun against her back.  He told her to give him the money in the cash register and to think about her life.  (Tr. 4.)  Briefly, the cashier turned her head to look at the robber, although it is not clear that she had a good opportunity to view him at that time.  The cashier was unable to open the register because of "nerves" and because there were customers in line.  (Gov't Ex. 4 [Doc. 144-3 at 6-7].)  About fifteen seconds after the robber first approached the cashier, two customers came up to the checkout counter, apparently not realizing that there was a robbery in progress.  The robber appeared to place his gun in his waistband or pocket and paced behind the cashier and to her side while the cashier rang up one of the customer's purchases.

At 9:00:50 p.m., the store manager re-entered the store and the robber started to walk out of the checkout area.  The manager encountered the robber heading

toward her as she walked past the checkout area, and at 9:01:06, the robber accompanied her into the checkout area.  The cashier looked toward the robber several times as he encountered the manager and followed the manager toward the register.  Briefly, the robber briefly displayed the gun before he again appeared to place it in his waistband or pocket.  In the checkout area, the store manager and the cashier stood facing the robber for several seconds, and at about 9:01:15, the manager began trying to open the register.  The cashier stood to the side of the register.  While the manager was trying to open the register, the customer who was checking out left to get money or her wallet from her car.  (Tr. 5.)  The cashier got the register open at 9:01:45, and both the manager and cashier stood to the side with their hands raised as the robber stuffed money from the register into a shopping bag for about 20 seconds.  The cashier and the manager both had an opportunity to view the robber at that time.[2]  The robber began walking out of the

---

[2] In reciting these facts, the Court has relied on the surveillance video from cameras 2 and 9, which was the camera footage the government showed during the evidentiary hearing.  The Court notes, however, that another surveillance camera, camera 13, clearly shows the cashier and the store manager looking at the robber while he removed cash from the register.  Camera 13 also shows that the cashier turned to look at the robber while she was assisting the customer, and that the robber leaned over the cashier to grab a plastic bag while the manager was opening the register, putting his face directly in front of the cashier's.

checkout area at 9:02:07 and left the store at 9:02:18.  The victims then secured the store and alerted authorities to the robbery.  (Tr. 4.)

Sergeant Phillip Stroud of the Kennesaw Police Department arrived at the Dollar General store within minutes of the robbery.  (Tr. 3-4.)  Both the cashier and manager gave written witness statements to Sergeant Stroud that evening.  (Tr. 12; Gov't Exs. 4, 5.)  The cashier described the robber as a black male with dark skin who was about 6'2" with a slim build and was wearing sunglasses and a blue and white shirt.  (Tr. 15-16; Gov't Ex. 4.)  The manager described the suspect as a black male in his late 50s who was six feet tall and was wearing a white polo shirt with blue stripes, blue jeans, sunglasses, and a hat or bandanna on his head.  (Gov't Ex. 5; Tr. 16.)  The store manager watched the surveillance video with Sergeant Stroud, possibly before she completed her witness statement.  (Tr. 13-14.)

## 2.    Applicable Lineup Procedures

Police departments in Georgia are required by state statute to have written policies for identification procedures, including live lineups, photo lineups, and show-ups.  O.C.G.A. § 17-20-2(a).  The written policies must provide, *inter alia*:

(2)    With respect to a photo lineup, having an individual:

(A)    Who does not know the identity of the suspect conduct the photo lineup; or

7

> (B)    Who knows the identity of the suspect use a procedure in which photographs are placed in folders, randomly shuffled, and then presented to the witness so that the individual conducting such procedure cannot physically see which photograph is being viewed by the witness until the procedure is complete[.]

O.C.G.A. § 17-20-2(b)(2).  The statute further provides that a "court may consider the failure to comply with [those] requirements . . . with respect to any challenge to an identification; provided, however, that such failure shall not mandate the exclusion of identification evidence."  *Id.* § 17-20-3.

The Kennesaw Police Department's written policy for photographic identifications required officers, in preparing a photo array, to use at least six photographs of individuals who were reasonably similar in age, height, weight, and general appearance and who were of the same sex and race.  (Gov't Ex. 6 [Doc. 144-3 at 8-20].)  Officers were directed to use photographs of the same size and basic composition and to avoid mixing color and black-and-white photographs and mixing mugshots with other types of photographs.  Further, the policy provided that more than one photograph of the same suspect should not be used in the array.  Officers were to cover portions of mugshots or other photographs that contained identifying information.  When conducting the procedure, an officer was to show the photo array to only one witness at a time.  The officer was required to preserve

8

the photo array and "full information about the identification process, for future reference."  Generally, when conducting identification procedures, officers were supposed to avoid suggesting the suspect's identity to the witness or otherwise making statements that might influence the witness's judgment and perception. Officers were also supposed to ensure, when possible, that the identification procedure was recorded. (*Id.*)  Notably, the Kennesaw Police Department's written procedure did not call for officers to use the "shuffle" procedure, as provided in the Georgia statute, when the officer conducting the photo lineup knew the suspect's identity. (*See id.*)

### 3. The Witnesses' Identifications of Everett in the Photo Lineup

On October 19, 2016, Officer Keith Todman (who was, at the time, a detective) and Detective Joseph Morgan, the case agent for the Dollar General robbery investigation, met with the cashier and store manager for the purpose of conducting a photo lineup.  (Tr. 30, 39-40; Gov't Exs. 13-16 [Doc. 144-1 at 29-32].)  Detective Morgan accompanied Officer Todman but did not personally participate in the identification procedures.  (Tr. 30.)  Officer Todman knew that Everett was the suspect at the time he conducted the identification procedures, but otherwise, he was not very familiar with the case.  (Tr. 21, 40.)  Officer Todman

and Detective Morgan first conducted the identification procedure with the cashier at her home and later conducted the procedure with the store manager at the Dollar General.  (Tr. 29, 35-36.)

Officer Todman used six total photographs for the photo lineup, one of Everett and five "filler" photographs.  (Tr. 20, 24-28.)  He knew that, for the fillers, he needed to use photographs that were "similar, similar age type similar in background and such," and not to use both black-and-white and color photographs or both mugshots and snapshots in the same lineup.  (Tr. 20.)  Detective Morgan, as the case agent, selected photographs obtained from Georgia's Department of Driver Services for Everett's photograph and for the filler photographs.  (Tr. 64.) The photographs are labeled "A" through "F."  (Gov't Exs. 7-12 [Doc. 144-1 at 17-28].)  Everett's photograph is labeled "C," and the remaining photographs are fillers.  (*Id.*; Tr. 26, 28.)  The photographs are approximately the same size, and all appear to have been cut out by hand.  (Gov't Exs. 7-12.)  All the photographs depict the faces of African-American men with dark complexions posed against a blue background.  Two of the photographs have a darker blue background, including Everett's.  None of the photographs contains any identifying information.  Everett

appears clean-shaven in his photograph, but three of the individuals in the filler photographs have close-shaven facial hair.  (*Id.*)

Before conducting the identification procedures, Officer Todman read to each witness the Kennesaw Police Department's Photo Line-up Identification Instructions:

> You will be shown a number of photographs viewing one at a time before moving to the next.  All of the photographs will be shown even if an identification is made.  Whenever you recognize anyone, please tell the Officer which photograph you recognize and how you recognize the individual.  Please indicate in your own words how certain you are.  The fact that the photographs are shown to you should not influence your judgment.  You should not conclude or guess that the photographs contain the picture of the person who committed the crime.  You are not obligated to identify anyone.  It is just as important to free innocent persons from suspicion as to identify guilty parties. Please do not discuss the case with other witnesses nor indicate in any way that you have identified someone.  Please carefully consider each photograph before you make a determination.  If you are able or unable to make an identification the police department will continue to investigate the crime.

(Tr. 22; Gov't Exs. 13, 15.)  The identification form listed the letters "A" through "F" and directed the witness, if she was able to identify the suspect in the photo lineup, to make an "X" by the letter corresponding to the photograph she had chosen.  (Gov't Exs. 13, 15.)  If the witness was unable to make an identification,

she could indicate that she was unable to do so by marking an "X" on a separate line.  (*Id.*)

In conducting photo identification procedures, Officer Todman's personal practice was to take the photographs to be used in the procedure from an envelope and turn them face down.  (Tr. 21.)  He would pass one photograph to the witness and have the witness view the photograph before passing it back face down.  (*Id.*) Officer Todman would place the photograph in a secondary stack and pass the next photograph to the witness, continuing the procedure until he had shown the witness the full "sequence" of six photographs.  (Tr. 21-22.)  Then he would ask whether the witness wanted to go through the sequence of photographs a second time.  (Tr. 22.)

At the outset of the identification procedure with the cashier, Officer Todman read her the directions from the Photo Line-up Identification Instructions form.  (Tr. 31; Gov't Ex. 13.)  The cashier did not ask any questions about the instructions.  (Tr. 31.)  Officer Todman then administered the six-photo lineup once, although he failed to fully complete the Department's Photo Sequence Form documenting the order in which the photographs were shown and whether the witness needed to review the photo sequence more than once.  (Tr. 32-33; Gov't

Ex. 14.)  The cashier identified Everett as the robber after viewing the full sequence and marked photograph "C" on her Photo Lineup form.  (Tr. 31, 33-34; Gov't Ex. 13.)  She indicated in writing that she chose Everett's photograph because "the mouth area looked familiar to the person that robbed my workplace."  (Gov't Ex. 13.)  Officer Todman recalled that the cashier was "very sure and very adamant" about her identification.  (Tr. 32.)  She was "very quick" in identifying the robber and was "very, very resolute" in her choice.  (*Id.*)  The identification procedure was not audio or video recorded.  (Tr. 60.)

Less than half an hour later, Officer Todman went through the same procedure with the store manager in the back office of the Kennesaw Dollar General.  (Tr. 36; Gov't Exs. 13, 15.)  Officer Todman did not ask the store manager whether she had spoken to the cashier that day.  (Tr. 45.)  The store manager viewed the six-photo sequence once and identified Everett as the robber after viewing the full sequence, making photograph "C" on her Photo Lineup form.  (Tr. 36-37, 45; Gov't Ex. 15.)  She explained in writing that she was "100%" certain the robber was depicted in the photograph she selected "because it made me go back to the night that it happen[ed]."  Officer Todman also recalled that the store manager was "extremely quick" to identify Everett.  (Tr. 37.)  As with the cashier's

identification, Officer Todman did not fully complete the Department's Photo Sequence Form documenting the order in which the photographs were shown or whether the witness needed to view the photographs a second time.  (Tr. 41.)  The identification procedure was not audio or video recorded.  (Tr. 60.)

### B.    Discussion

The Eleventh Circuit has adopted a two-part analysis to determine whether an out-of-court identification procedure violates due process.  First, the Court considers whether the identification procedure was unduly suggestive.  *United States v. Diaz*, 248 F.3d 1065, 1102 (11th Cir. 2001).  If the Court concludes that the identification procedure was not unduly suggestive, then the inquiry ends.  If, however, the Court concludes that it was unduly suggestive, then the Court considers whether, under the totality of the circumstances, the identification was nevertheless reliable.  *Id.*  The Supreme Court has identified factors the Court should consider to determine the reliability of an identification, including:  (1) the opportunity the witness had to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the suspect; (4) the level of certainty demonstrated by the witness in making her identification; and (5) the length of time between the crime and the identification.  *Id.* (citing *Neil v. Biggers*, 409 U.S. 188 (1972)).

14

Relying on that two-part analytical framework, Everett argues that the cashier's and the store manager's identifications should be suppressed because they were the products of unduly suggestive identification procedures and because they are not otherwise reliable.  [Docs. 161, 166.]  He also argues that, if the Court does not find that the identifications should be suppressed on the record before the Court, the hearing should be re-opened so that the Court can hear the testimony of the cashier and store manager about the identification procedures and the reliability of the witnesses' identifications.  [*Id.*]

### 1.    The Photo Lineups Were Not Unduly Suggestive

Beginning with Everett's specific arguments that the identification procedures were suggestive, he argues that his photograph was highly distinguishable from the filler photographs.  [Doc. 161 at 4, 15-16.]  Everett points to the "bright blue background" that appears in only his photograph and one of the filler photographs.  [Doc. 161 at 4, 15-16.]  He also points out that, in his photo, he is wearing a "bright red" article of clothing.  [*Id.* at 4.]  In addition, he notes that he is clean-shaven in his photograph, but three men in the filler photographs have facial hair.  [*Id.* at 4, 16.]  Generally, minor differences between photographs do not render a photo array unduly suggestive.  The Eleventh Circuit has noted that a photo lineup "is not unduly suggestive merely because the defendant's photograph

15

can be distinguished from the others." *United States v. Smith*, 148 F. App'x 867, 874 (11th Cir. 2005). For the reasons that follow, the Court does not find that the minor differences between Everett's photograph and the filler photographs render the photo lineup at issue here unduly suggestive.

For starters, Everett's argument about his "bright red," eye-catching clothing is somewhat overstated. In his photo, Everett appears to be wearing a dark jacket over a dark blue plaid collared shirt, and a small patch of red is visible between his collar and jacket. The red patch is not visually overwhelming, and Everett's clothing does not make his photograph stand out. One of the filler photographs similarly depicts a man wearing a coat or jacket. In *Smith*, the Court did not find a photo array unduly suggestive where the defendant's photograph was on a different background from the filler photos, and the defendant was one of only two individuals shown in a blue shirt, which the suspect was alleged to have worn. 148 F. App'x at 874. Not only is Everett's clothing unremarkable, it is not similar to the suspect's clothing from the night of the robbery—a white collared shirt with dark trim. Notably, one of the men in the filler photos *is* shown in a white collared shirt.

16

The difference between the background of Everett's photograph and the backgrounds four of the filler photographs also does not render the photo lineup unduly suggestive.  *See United States v. Knight*, 382 F. App'x 905, 907 (11th Cir. 2010) (difference in background lighting for defendant's photograph and the fact that defendant had a lighter complexion than men depicted in four filler photographs did not render a lineup unduly suggestive); *United States v. McComb*, 249 F. App'x 429, 440 (6th Cir. 2007) ("A darker hue or different colored background does not in [itself] create an impermissible suggestion that the defendant is the offender." (alteration in original) (internal quotation omitted)); *Smith*, 148 F. App'x at 874 (photo lineup not unduly suggestive where only the defendant was shown against a cinderblock background); *United States v. Hood*, No. 1:17-cr-421-SCJ-LTW, 2018 WL 7286179, at *7 (N.D. Ga. Oct. 25, 2018) (concluding that a photo array was not unduly suggestive where the defendant's photograph had a different background from every filler photograph, the defendant was the only person depicted who was of a medium brown complexion, only the defendant was showing his teeth, and the defendant's face tattoo was digitally added to the filler photographs), *report and recommendation adopted*, 2019 WL 169144 (N.D. Ga. Jan. 11, 2019); *United States v. Mustafa*, No. 1:11-cr-234-01-

17

CAP-AJB, 2012 WL 1904595, at *14 (N.D. Ga. Apr. 12, 2012) (concluding that a photo array was not unduly suggestive where the photos had approximately the same color background, but the defendant's photograph had a slightly lighter background), *report and recommendation adopted*, 2012 WL 1903255 (N.D. Ga. May 25, 2012).   Additionally, Everett's photograph is not the only one with a darker blue background, as one of the filler photographs has the same background. The Court also finds it unlikely that the witnesses would have focused on (or even noticed) the difference between the blue backgrounds because the photographs were presented to the witnesses one at a time.

As to Everett's argument that his photograph stands out because three of the filler photographs depict men with facial hair, courts have found that minor differences in facial hair do not necessarily make a lineup suggestive.  In *Cikora v. Dugger*, the Eleventh Circuit found that a photo array was not suggestive where the defendant's photograph depicted facial hair that was sparser than the facial hair of the men in filler photographs.  840 F.2d 893, 897 (11th Cir. 1988).  Notably, Everett is not the only clean-shaven man depicted in the photo lineup; two other men in the filler photos are shown without beards or mustaches.  The men in filler photographs who are depicted with facial hair have very slight, close-shaven facial

18

hair, which does not distract from their facial features or make any particular photograph stand out. *See United States v. Felix*, 591 F. App'x 777, 781 (11th Cir. 2014) (finding that a lineup was not suggestive even though Defendant was one of only two photos without facial hair where the other men in the lineup had only very slight facial hair); *see also United States v. Thurston*, 771 F.2d 449, 452-53 (10th Cir. 1985) (photo array not suggestive where all the photos depicted men of similar complexion and facial profile, but defendant was the only person with a beard); *United States v. Penney*, No. 4:18-cr-2-HLM-WEJ-1, 2018 WL 4520213, at *2 (N.D. Ga. July 23, 2018) (finding photo array not unconstitutionally suggestive where four of the six filler photos depicted men with receding hairlines, and of the men with more hair, only the defendant was smiling), *report and recommendation adopted*, 2018 WL 3707417 (N.D. Ga. Aug. 3, 2018). The Court therefore does not find that the inclusion of photographs of men with slight facial hair in the photo lineup rendered the lineup unduly suggestive.

Everett next argues that the identification procedure Officer Todman used was suggestive and prejudicial because he failed to follow either the procedures required by Georgia law and by the Kennesaw Police Department for photo lineups. [Doc. 161 at 8, 16.] Officer Todman knew the identity of the suspect, yet he failed

to randomly shuffle the photos in the folder so that he could not see which photograph the witness was viewing.  [*Id.*]  Further, Officer Todman failed to properly document the photo sequence and the number of times each witness viewed the sequence and failed to record the identification procedure.  [*Id.* at 4-5, 8.]  Everett also points out that Officer Todman had a disciplinary record at the Kennesaw Police Department for his handling of other investigations.  [*Id.* at 5-8, 16.]  He argues that Officer Todman is not credible because he was "evasive" and "defensive" about his disciplinary record at the hearing.  [*Id.* at 6-7.]  Everett also contends that, without the testimony of the witnesses, there is no way of knowing whether Officer Todman said or did anything, consciously or unconsciously, to suggest Everett's photograph to the witnesses.  [*Id.* at 16.]

As an initial matter, the Court is aware of Officer Todman's disciplinary record for failing to properly investigate several cases.  In 2018, he was disciplined for failing to prepare a complete investigation file for a sexual assault and for failing to obtain certain records in investigating an elder abuse case.  (Tr. 49-54.)  The Court also has considered other items in Officer Todman's disciplinary file relating to failure to follow department procedures, his failure to attend court and to comply with court orders, and his overall work effort.  [Doc. 149 at 6-24; Doc. 157 at 5

n.4.] These disciplinary records underscore Officer Todman's failure in the instant case to follow the Kennesaw Police Department's procedures for conducting the photo lineup. But the Court, in its own assessment of Officer Todman's testimony and demeanor at the evidentiary hearing, finds that he credibly testified about his own procedures for performing photo identifications and about his employment of those procedures during the identifications at issue in this case.

Everett is correct that Officer Todman's identification procedure did not fully comply with the procedures called for by Georgia law or with the Kennesaw Police Department's written policy. Georgia law calls for an officer who knows the identity of the suspect in a photo lineup to shuffle photographs so that the officer does not know which photograph is being presented to the witness. Officer Todman did not shuffle the photographs before passing them to the witnesses. But even in Georgia's state courts, an identification procedure that deviates from the Georgia statute does not automatically result in suppression. *See* O.C.G.A. § 17-20-3. Similarly, an officer's failure to abide by the very best practices in a photo identification procedure does not necessarily result in an unconstitutional identification procedure. *See United States v. Chance*, 277 F. App'x 941, 945 (11th Cir. 2008) (detective's remark to victim that a suspect had been arrested did not

render identification procedure unconstitutionally suggestive, where detective did not identity who in the lineup had been arrested); *Cikora*, 840 F.2d at 896-97 (officer's statement that the suspect was in the photo lineup, without indicating who the suspect was, was not unduly suggestive).   Officer Todman's method of presenting the photographs to the witnesses may not have insulated the identification procedure from his knowledge of the suspect's identity as well as the "shuffle" procedure contemplated by the Georgia statute.   But there is no indication that his method was suggestive based on the facts at issue here.   Officer Todman passed the photographs face down and one at a time to the witnesses and required each witness to view the full photo sequence before making her identification.

Officer Todman also failed to make an audio or video recording of the procedure, to document the photo sequence, or to record the number of times each witness viewed the sequence.   He did, however, preserve the marked photographs, allowing the Court to be certain that the witnesses selected Everett's photograph. Officer Todman also credibly testified that both witnesses were quick to identify Everett.   Based on Officer Todman's testimony about the procedure he used, the Court finds that he did not present the photo lineup to the witnesses in a manner that was suggestive or prejudicial.

Everett seems to suggest that the witnesses could have talked to one another about the lineup procedure. [Doc. 161 at 5.] That suggestion is mere speculation, particularly because Officer Todman conducted the identification procedures with the cashier and the store manager within half an hour at different locations.

Based on the foregoing, the Court does not find that the photo identifications conducted here were unduly suggestive, either because of the photographs used in the lineup or because of the manner in which Officer Todman administered the lineup procedures.

## 2.     The Identifications Were Reliable

Even assuming the photo lineup procedure was unduly suggestive, though, the identifications were sufficiently reliable in view of the relevant factors. As noted above, the factors include: (1) the opportunity the witness had to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the suspect; (4) the level of certainty demonstrated by the witness in making her identification; and (5) the length of time between the crime and the identification. *Diaz*, 248 F.3d at 1102.

Regarding the victims' opportunity to view the suspect, the cashier had several opportunities to view the suspect's face, particularly when he was bringing the store manager to the register area and taking cash out of the register. The store

manager also looked directly at the suspect several times as he followed her into the checkout area to open the cash register.[3]  Even though the robbery only lasted a few minutes, the surveillance footage makes clear that both victims had good opportunities to view the robber.  *See O'Brien v. Wainwright*, 738 F.2d 1139, 1141 (11th Cir. 1984) (close-up view of a burglar for only a few seconds in a well-lit room was sufficient opportunity to view).

Regarding the witnesses' degree of attention, Everett argues that the witnesses were not always looking at the robber and were fearful during the robbery and therefore were not paying much attention to the robber's face.  [Doc. 161 at 17-18.]  He also argues that he has been precluded from presenting evidence regarding the witnesses' attention because he was not allowed to call the witnesses at the hearing.  [Doc. 166 at 2.]  Even without the testimony of the victims, the evidence of record contains indicia of the witnesses' attention to the robber's face. The store manager stated that seeing Everett's face in the photograph "took [her] back" to the night of the robbery.  (Gov't Ex. 15.)  The cashier stated that she

---

[3] Everett argues that Officer Todman did not know about the victims' opportunity to view the robber [Doc. 161 at 5], but Officer Todman's knowledge of their opportunity to view is irrelevant to the overall reliability of the identification.

selected Everett's photograph because of his "mouth area," which indicates that she was paying a good deal of attention to his facial features during the robbery. (Gov't Ex. 13.)  The witnesses' statements make clear that they were both paying attention to his face during the robbery.

Turning to the accuracy of the witnesses' descriptions, Everett argues that the cashier described nothing about the robber's face other than his sunglasses and did not mention his hat.  [Doc. 161 at 18.]  He also contends that the store manager had a tainted view of the robbery because she viewed the surveillance video with Sergeant Stroud the night of the robbery.  [*Id.*]  As to the cashier's description, the cashier accurately described the robber as a black man with dark skin who was about 6'2" with a slim build and was wearing sunglasses and a blue and white shirt. (Gov't Ex. 4.)  The fact that she did not mention the robber's hat or head covering does not, overall, make the cashier's description inaccurate.  Nor is it reasonable to expect the cashier to have provided a detailed verbal description of the suspect's face, absent any remarkable facial features.  As to the store manager's viewing of the surveillance video before she gave her witness statement on the night of the robbery (Tr. 13-14), even if watching the video affected the store manager's

recollection of the robbery itself, it could not have affected her memory of the robber's face because his facial features are not clearly discernible in the video.[4]

The next factor is the witnesses' level of certainty in their identifications. Everett argues that the cashier "only" stated that, for the photograph she selected, "the mouth area looked familiar to the person who robbed my workplace." [Doc. 161 at 18.] The Court does not view that statement as equivocal or expressing uncertainty. The cashier's explanation that she made the identification based on the "mouth area" of the photograph makes sense, because that was the part of the robber's face she saw, given that the robber was wearing a hat or other head covering and sunglasses. Everett also argues that the store manager's statement that Everett's photograph took her back to the night of the robbery should be discounted because she had a limited opportunity to view the robber. [*Id.*] As discussed above, however, the store manager had a good opportunity to view the

_____

[4] Everett raises this argument in terms of the reliability of the store manager's identification but does not raise the issue in terms of police misconduct or suggestibility. *See United States v. Elliot*, 732 F.3d 1307, 1310 (11th Cir. 2013) (rejecting argument that a witness's observation of surveillance video made an identification procedure suggestive because the witness's viewing of the video prior to viewing a lineup was not the result of police misconduct). The Court notes, however, that the store manager's viewing of the surveillance video did not render the identification procedure suggestible because the robber's face is not clearly visible in the video.

robber.  Officer Todman also testified that both the cashier and the store manager were quick and decisive in selecting Everett's photograph.  Everett speculates that Officer Todman might have cued the witnesses [*id.*], but the Court finds Officer Todman's testimony about how he conducted the identification procedure credible.

As to the final factor—the time between the crime and the identification—the Court finds that the two-month gap between the robbery and the identifications does not render the identifications unreliable.  *United States v. Burke*, 738 F.2d 1225, 1229 (11th Cir. 1984) (two-month gap between witness's observation of suspect and identification of suspect from a wanted poster did not render identification unreliable).  Courts have found even longer gaps between the crime and identification not too long.  *See Archuleta v. Kerby*, 864 F.2d 709, 712 (10th Cir. 1989) (collecting cases where gaps between two months and one year were found to be not too long).  Based on the foregoing factors, the Court concludes that the identifications were reliable.

### 3.   Conclusion

In sum, the identification procedures were not unduly suggestive.  Even if the identification procedures were suggestive, the identifications were nevertheless reliable.  Because the Court has determined, on the present record, that the identification procedures were not unduly suggestive and that the identifications

were reliable, it is unnecessary to re-open the hearing to allow Everett to examine the victims.  It is therefore **RECOMMENDED** that Everett's Motion to Suppress Identification [Doc. 116] be **DENIED**.

### III.    Motions to Dismiss [Docs. 117, 125]

Everett moves to dismiss Counts Three, Six, Nine, Eleven, Thirteen, and Fifteen of the superseding indictment, that is, all counts charging a violation of 18 U.S.C. § 924(c).  [Doc. 117.]  Everett concedes, however, that his arguments are precluded by binding Eleventh Circuit precedent,[5] and that he filed his motion to prevent any assertion that he waived his arguments.  [*See id.* at 1-3.]  Accordingly, it is **RECOMMENDED** that the motion to dismiss be **DENIED**.

---

[5] The Supreme Court recently held that § 924(c)'s residual clause is unconstitutionally vague.  *United States v. Davis*, No. 18-431, ___ S. Ct. ___, 2019 WL 2570623 (June 24, 2019), abrogating the Eleventh Circuit's holding in *Ovalles v. United States*, 905 F.3d 1231 (11th Cir. 2018) (en banc).  The so-called "elements" clause of § 924(c)(3)(A) remains in effect, however, and binding Eleventh Circuit precedent indicates that the predicate offenses of armed bank robbery and Hobbs Act robbery are crimes of violence for purposes of § 924(c)(3)(A).  *See United States v. St. Hubert*, 909 F.3d 335 (11th Cir. 2018) (Hobbs Act robbery is a crime of violence under § 924(c)(3)(A)), *r'hrg en banc denied*, 918 F.3d 1174 (11th Cir.), *cert. denied*, 139 S. Ct. 1394 (2019); *In re Fleur*, 824 F.3d 1337, 1340 (2016) (11th Cir. 2016) (same); *In re Hines*, 824 F.3d 1334, 1336 (11th Cir. 2016) (armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d) is a crime of violence under § 924(c)(3)(A)).

Everett also moves to dismiss the indictment "to the extent" that it alleges that he should be sentenced as an armed career criminal under 18 U.S.C. § 924(e). [Doc. 125.]  Since this matter pertains to sentencing, Everett's motion is premature and should be deferred until then.  Accordingly, it is **RECOMMENDED** that the motion to dismiss the enhanced penalty under section 924(e) be **DENIED** without prejudice to raise the matter at sentencing.

## IV.    Conclusion

For the foregoing reasons, it is **RECOMMENDED** that the motion to suppress be **DENIED** [Doc. 116], the motion to dismiss the § 924(c) counts be **DENIED** [Doc. 117], and the motion to dismiss the indictment as to the § 924(e) enhancement be **DENIED WITHOUT PREJUDICE** to Everett raising the issue at sentencing [Doc. 125].

There are no matters pending before me for this defendant, and I have not been advised of any impediments to the scheduling of a trial.  Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

IT IS SO RECOMMENDED this 5th day of July, 2019.

_____

JOHN K. LARKINS III
United States Magistrate Judge

29